Good morning ladies and gentlemen. Our first cases for this morning are the consolidated cases of Brodsky v. HumanaDental Insurance and Alphatech Pet v. Lagasse. So we will begin Mr. Herra with you. Thank You Judge Wood, Chief Judge Wood, and if it pleases the court, my name is Glenn Herra. I represent the plaintiffs in these appeals. Alphatech Pet Inc., Craftwood Lumber Company, and Craftwood II Inc. in the case against Ascendant, also known as Lagasse, and Lawrence Brodsky in the case against HumanaDental Insurance Company, which we often refer to as HDIC, HumanaDental Insurance Company. I want to thank the court for consolidating these cases for argument because the cases are not factually identical, but the legal issues that are substantially overlapped are the same. We could see that from your briefs I might add. There is a slightly different focus because the Brodsky court did not reach the effect of the DC Circuit's decision in this jurisdiction, whereas the Alphatech court did, but otherwise the legal issues are the same. So I'd like to reserve 10 minutes of my time for rebuttal. It's up to you to watch that time thing. Great. When it's 10 you can wrap up and sit down. Very well. So there are two main legal issues. The first would be whether this court's 2013 ruling in Holtzman v. Terza that the sender of a facsimile advertisement must include a compliant opt-out notice on the fax in order to assert a defense of established business relationship, which is EBR, or consent or prior express invitation or permission in the statutory language. Whether that ruling is binding on district courts in the Northern District of Illinois, as we contend it is, or as the district courts in this case, these cases held, is it merely non-binding dicta? You know, it's hard to find in Terza any indication that the issue that you are focusing on, that you and your opponents are focusing on in this case, was before the court there. There's a statement in the first paragraph which might mean the regulation covered it, might mean the statute covered it, but I don't see any indication that was really thoroughly litigated. There is that, there is a sentence in the introduction where the court cites the statute, and then later in the court's analysis in the fourth paragraph in, the court applies that rule to the facts of the case and holds that because Top of Mind omitted opt-out notices, Top of Mind was the marketing company that the defendant hired in Terza, you get the exact it does not matter which recipients consented or had an established business relation with Terza. And the court contrasted that, this case, with Jean and Jean, which was a Fifth Circuit case where the faxes was sent before the opt-out notice requirements became effective in 2006, where the court held that individualized issues of consent predominated. So let me ask you a somewhat different question. I mean, I take your point about some of the language in Terza. I still don't think that that tells me that there was a real focus on that, but suppose there was. We do now have a remand from the D.C. Circuit in the case before it, and I think actually the parties may have overstated the scope of the case before the D.C. Circuit, and some statements from the Federal Communications Commission. Should we wait to see what the FCC does on remand before we decide this case? If the court doesn't agree with us about Terza, that it's binding and that it means what it says, that the statute requires opt-out notice, it would not be unreasonable to wait and see what the FCC did going forward, or how it reached whatever conclusion it's going to reach going forward, given the new, the way it's constituted now. It's a different leadership now at the FCC, it's a republic. Well, I mean, yes, so it goes in life. But I do have to say, I want to that wouldn't change whether the faxes in this case were subject to the regulation, which was binding and in effect at the time that these faxes were sent. Well, is there any inconsistency in your position about that and your position about the waiver? Because the FCC appears to have recognized that there was some ambiguity in the regulation. There's somewhat invited people, such as Humana, such as the other parties here, to come in and get a waiver, and they did. And the FCC said, you know, you're okay. And so if we're really going to be relying on the FCC, isn't that something we should take seriously as well? I agree the court should take it seriously, but you know, as we've argued, those waivers can't affect a private statutory right of violation of the regulations prescribed under the statute. Why not? Because it's a question... I mean, they're talking about effectively the scope of the regulation. They're almost talking about, you know, a delayed effective date or whatever. It's an unusual sort of thing, I agree. It's very unusual. I agree the effect of it in practicality is that the FCC delayed the effect of the rule by eight years and said it hasn't been effective since 2006. But that wasn't its rationale. Its rationale was that the rule is valid, and we issued it, you know, pursuant to our statutory authority under the TCPA. But there was this general sense of confusion in the air about what the law was. So we're going to let everybody off the hook who asked for one who doesn't admit that they were just ignorant of what the law is. So that's all you had to do, is ask for one and be careful enough not to say we weren't aware of the TCPA, which is probably actually the truth in a lot of these cases. What would have happened if, because actually in both of these cases, I'm not finding the language right away, but it doesn't matter. In both of these cases, the faxes that were sent did have a sentence that said, you know, if you're having a problem with this, here's a number. There were 800 numbers that people could call, which I did not memorize, but there were numbers. Suppose the FCC had instead said, you know, we think it's important to give people an opportunity to revoke permission, so to speak. You know, we've got established business relationship, which doesn't seem to be what we're doing. We seem to be on the consent branch of this. I don't know. But anyway, they said, you know, we're just going to take a more lenient approach to what that notice of these people, we don't have a situation where faxes came that were utterly silent about what to do. We have simply notices that maybe don't comply with with the letter of the regulation. I think the FCC could have done something like that, but I think under any reasonable standard, the notices in this case wouldn't pass muster because they're both very similar. They have a only part of it that complies. But why isn't that the key part? You know, if somebody says, hey, you know, I don't want to get these annoying faxes from Humana, I'm going to call this number and say take me off the list. How hard is that? The other question is, how hard is it to include a compliant opt-out notice? I would say that's de minimis. Any lawyer could draft one in 15 minutes. So what? I mean, answer my question. Why is it all that hard and burdensome to use the number they've given you, call? And my main point is, why couldn't the FCC, in creating a waiver, say we're going to, at least in these companies' situations, it wasn't a blanket waiver. They didn't repeal the regulation. They made people come in and ask, right? Correct. Yeah. Right. They were asked to do a blanket waiver and they didn't want to do that. Right. So I think it could have, but the opt-out notices in this case, it's very important that they're not clear and conspicuous. So the recipient wouldn't, there wouldn't be apparent to a reasonable consumer. They don't advise the recipients of important factors that the regulations and the statute require, such as that the request is binding only if you use the instructions in the opt-out notice. So if you have a number for a salesperson at the company or something like that and you call that other number and say take me off your fax list, that's not good enough to be an enforceable request. If they keep sending you faxes after that, you would not be able to sue on them because your permission would not have been revoked. Okay. Can I just ask you one more question before your initial time runs out? Yes. This is a 23-F appeal. Correct. The district courts in both instances concluded that common questions didn't predominate. Really just a class-action kind of ruling, not a merits ruling, a case administration ruling. Why isn't that enough to dispose of these appeals? We give the district judges a great deal of discretion over those kinds of calls. Why did this district court, these two district judges, abuse that discretion? It's because that decision that individualized issues of prior express permission predominated was based on legal errors, on pure errors of law in our position. One, that tersa is dicta when we say it's actually ruling the case and if the defendants want it to be overruled, that should be their burden to re-hearing en banc, and that the regulation is valid and it applies to the faxes in these cases, notwithstanding the waivers that the defendants got from the Bureau, which is on appeal to the FCC right now. My clients have appealed that to the full Commission. It's not a final order, and once we do get a final order, if it's adverse to us, we will take a Hobbs Act appeal from that to either this court, where two of my clients reside, or the Ninth Circuit, or the First Circuit, where AlphaZac has this principal place of business, and that the DC Circus decision is not binding in a federal district court in the Northern District of Illinois. It can't work that way, and the rationale of, you know, that that was a consolidated Hobbs Act appeal, and we went through all those in our briefs and we'll talk more about it in rebuttal, but circuit courts decisions bind in a vertical hierarchy. They bind the district courts in that jurisdiction. All right, thank you very much. So, you are Ms. Mazzuchetti? Mazzuchetti? Mazzuchetti, that's correct, Your Honor. Thank you. Good morning, Your Honors. Laurie Mazzuchetti for the defendants in the AlphaTec case. I want to start by addressing Terza. It is true, Your Honors, that Terza did not reach a holding that the solicited fax rule applies. It did apply the solicited fax rule to the fax before, didn't it? If you look at the procedural history of that case, what was at issue was the established business relationships, established business relationship exception under the TCPA, which governs unsolicited faxes that happen to be sent to customers. So, at the time that Judge Easterbrook wrote the Terza opinion, and the fourth sentence provides an overview of the law, he was exactly correct that that was the state of the law at the time. The court cited to the TCPA statute, which I don't know if the intention was, I'm citing to this, the court is citing to the statute and thereby incorporating the regulations promulgated there under, or perhaps the solicited fax rule should have also been cited, because there's no debate that in the TCPA there is not a requirement to include opt-out disclosure language on solicited faxes. Well, but the question, I think, and I want to get to the Yakov case too, but the question is going forward, you know, you have either the established business relationship or the consent. We're on consent, I think, and going forward, suppose you don't want to consent anymore. I mean, I think the motivation behind the rule that the FCC passed, which didn't, it wasn't called the solicited fax rule, it was just a rule trying to make sure that people who didn't want faxes going forward, even if they had accepted them in the past, had a way of making that view known, and that was through the same mechanism of giving the numbers and all the rest of it the conspicuous disclosure. Understood, Your Honor, and that's the issue that the Bias-Yakov Court had dealt with. Well, it sort of dealt with it. I think both parties have vastly overread that, because I'm going to read you the holding of the Bias-Yakov case. The court says, we hold that the FCC's 2006 solicited fax rule is unlawful to the extent that it requires opt-out notices on solicited faxes, and then, now we come to what it really did. The FCC's order in this case, that was a 2014 order, interpreted and applied that 2006 rule, so it's an application. We vacate that 2014 order and remand. This was not an end run around the timeliness rules of bringing a Hobbs Act challenge to the 2006 rule, because if all people had to do was just say, oh, well, now you've applied it, there wouldn't even be a time limit. So I think what the D.C. Circuit did was to simply vacate a 2014 order, and that has some implication for the breadth of the holding, the breadth of the application. This was not just a straightforward Hobbs Act attack on the rule, which might have had national effect. I assume that for the sake of argument. So the D.C. Circuit actually just recently addressed this issue in another TCPA appeal called ACA International, and there were issues related to an FCC's 1992 order and a 2008 order, and there was a question of timeliness. And what the D.C. Circuit said is, actually, the petition for review up to the D.C. Circuit from the 92 or the 2008 order in an untimely matter, they went back to the agency and said, we need some guidance here. And then once that ruling became a final order, the issue was timely brought to the D.C. Circuit. So here... But that's the only thing that's... I agree with all of that, but that's the only thing that's before us, too. It's not... When we look at what the D.C. Circuit did, in a real Hobbs Act situation, a direct attack on the rule, the statutory system boils it down to one court of appeals that's going to take that. And that sort of implicitly, just as though this court were to look at a patent case. Well, they belong in the Federal Circuit. It's not like... Well, we can't do a collateral attack on a Federal Circuit patent issue any more than you can do a collateral attack on a Hobbs Act case. But it's... This is different. This is the application of the 2014 rule, which, I mean, we can certainly read respectfully what they said, but it's not the same thing as the 2006. But it's important to view where that 2014 rule came from. So as the FCC acknowledged,  it was a case of implicit or unsolicited faxes. So let me ask you a question about that. Yes, there was confusion. I pointed that out to your opponent. Is it your sense that the FCC can selectively and retroactively repeal regulations or waive regulations? Well, it's an interesting issue. Isn't that arbitrary? I don't see any reason for who got the benefit of a waiver and who didn't. It's an interesting question, Your Honor, and one that the DC Circuit didn't reach in Bias Yaakov. But the FCC, given the confusion that folks had over their... And the FCC admitted that it had been internally inconsistent. I think it was the right course for the FCC, particularly considering the consequences. But it's just a matter of power, though. Suppose the FCC had said, we're going to waive the 2006 solicited fax rule for all companies with names beginning in L. Is that okay? That example, Your Honor, I believe the FCC would be acting outside the scope of its authority. Yeah, it would be arbitrary, capricious, etc., etc., all those things we say under the ADA. But in this instance, it wasn't arbitrary and capricious because you had ANDA, who in 2010 goes to the FCC and says, this doesn't make sense. We have a plaintiff suing us, claiming that on a solicited fax, one sent with prior express permission, which the TCPA doesn't regulate, that we are now facing millions, if not hundreds of millions, in exposure because we're not including a compliant opt out notice. When we read your orders, FCC, you say first, it should be included on unsolicited faxes, and then later, that it should be included in solicited faxes. So what the FCC did there, and also, ANDA did ask the FCC to address the issue of its own authority. Did you, FCC, have the authority to be regulating in the area of solicited faxes at all because the TCPA didn't give you that authority? And the FCC, of course, answered that question and stood by their solicited fax rule, but noted the unfairness. Because of their prospective concerns. Just to give the FCC some credit, and this is, of course, formal rulemaking, Chevron considerations come in. We are not the Supreme Court. When you walked in the Dirksen building, you probably saw that. So if Chevron goes by the wayside, so be it. But at the moment, it's there. Understood. Yes. And so the FCC reached its ruling, and then there was a petition for review taken under the Hobbs Act. And that brings to, I think, a really important question in this case, what the plaintiffs are advocating for is to write the Hobbs Act out of existence. Oh, I don't think so. I think that they're just saying what's the scope of what the DC Circuit did. If the DC Circuit had had before it a direct attack on the 2006 regulation, then as I told you, at least as far as I'm concerned, that's the DC Circuit's business. Such a direct attack can come in one of the regional courts from the FCC, in which case the DC Circuit wouldn't have had any business looking at it. But they got it through the normal procedures of the Hobbs Act. Under the Hobbs Act, final orders by an agency that are governed by the Hobbs Act are... You can bring a petition for review under the Hobbs Act. I know. And that's what the 2014 order was, although it did call into question a 2006 ruling. But it's just an application of the 2006 ruling, and there could be other applications. And so the DC Circuit was not ruling for all sorts of applications that were not before it. I do think the DC Circuit made very clear that they were invalidating, as unlawful, the FCC's ability to regulate solicited faxes, which is what the 2006 rule did. And it was a completely... So they overreached, you're saying? No, I don't believe so at all. They did not have that issue before them. They actually... I believe that they did, Your Honor, because ONDA had called that... That was the question that ONDA had brought to the FCC. It was the application of the 2006 rule. They... In the ONDA application, they did ask the FCC to opine or make a decision on its own authority. Its own advisory opinion? No. They asked the FCC to look at whether it had, A, the authority to govern solicited faxes, if it determined that that's, in fact, what it had done. And if it had, in fact, done that, then to look at the internal inconsistencies. So isn't that the issue that's right now before the commission on remand? Well, on remand, I think what the FCC is going to have to do is deal with these fax waiver orders that are out there. And I think there ultimately will be some agency action taken, which may result in another final order, which would then create the potential for another Hobbs Act appeal. But as things stand at this point, the solicited fax rule, 2006 order and the 2014 order, have been invalidated by the DC Circuit. Yeah. I disagree with you on the first of the 2014 order and remand for further proceedings. They didn't say they were invalidating the 2006 solicited fax rule. And if that... They didn't have the power to. It wasn't before them. Even if that is correct, Your Honor, the application to this case depends on the 2014 ruling. The same one, yeah. And that would get us back to the same result, and that would mean that the district court did the right thing here, and they should be affirmed. Okay. Sounds good. Thank you. Mr. Jeffrey. Morning, Your Honor. Joe Jeffrey on behalf of HDIC. Some of what I was planning on covering this morning has already been discussed. My focus this morning was gonna be on the FCC's waiver of the solicited fax rule. Obviously, I'm happy to answer any other questions you may have, but that's really where I was going to start. No, I'd be interested to hear what you have to say about the waiver. Well, I think it's important, in light of the conversations that we just had, I think it's important to kind of recap where the waiver came from. The FCC had identified widespread industry confusion based in part on a footnote that was part of its guidance. The footnote was the strange thing. It was indeed a strange thing, Your Honor. In addition to that, their notice of proposed rulemaking was arguably defective. And I think that in light of all that, what the FCC did is what plaintiff's counsel acknowledged, they delayed the effective date. That's what the waiver essentially did, is it delayed the effective date of the solicited fax rule for folks who came in and said, I've sent a fax without a compliant opt out notice before April 30, 2015. Now, your client was one of the ones that came in and received, by name, the waiver, right? That's correct. So did you have to make any particular showing to do that? Did you just have to stand up there and say, we were confused by the tension between your footnote and the text of your order? We had to show that we were similarly situated to the entities and individuals who had received a waiver in the 2014 ONDO order, which was that we had sent faxes during that time period. And that was essentially the showing that was required. Did anybody get turned down for a waiver? People got, there were applicants in the 2016 order, which is the one that granted the waiver to HDIC, that said, they said, we knew nothing about the footnote, we knew nothing about, well, they may not have mentioned the proposed rulemaking, but they said they didn't know anything about the confusion. And the FCC had said at that point, well, then, sorry, you don't get a waiver. So where does that leave? Because, and I'm sorry to interrupt, because then you're not similarly situated, is what they were saying. Right, yeah. It leaves things in a funny situation, doesn't it? With... Given the legal basis, at least, of the DC Circuit's opinion, which I do think relates to the 2014 order, that was what was before the court, that was what the petition for review presented to the court. I know there's language, there's dicta in the opinion about sweeping the entire... In fact, there's actually dicta in the opinion about who uses fax machines anyway, which is where Judge Kavanaugh starts, a good question. Does anybody use fax machines anymore? I don't know, Your Honor. I can tell you that I'm not perceiving faxes these days. That's about as far as I can go. These cases keep showing up, though, so somebody must be using them. I have to agree that I don't know anybody that does either. The Second Circuit, I'm told, does, for reasons best known to itself. But... So maybe this is a particularly apt appeal for the Second Circuit. Yeah, I just am concerned about what seems to be a rather arbitrary disposition of the waivers, and wonder if there's anything that we should do about that. Well, I think, to that point, Your Honor, and I know you had some discussion with Ms. Mazzuchetti about this, but to that point, if there's a problem, if plaintiff's counsel has a problem with the content of the waiver, waivers, I guess, that were received in this case, this isn't the time to address it. Those arguments aren't ripe now. They're not gonna be ripe until the FCC issues a final order, and they're presented before either this court or another court. In the proceeding, yeah. That's correct, Your Honor. So it would be your position, let me just see if I have this right, that even if the plaintiffs are correct that the TCPA covers, or at least empowers, the FCC to speak to both existing consent and future consent, so that the solicited fact, what we're all calling the solicited facts rule is okay. If the commission has that power, it also has the power to modify the application of its own rule. I'll try to use neutral terminology. And once it's modified the application for people like your clients, the commonality of the question of consent disappears, and so this was properly not handled as a class action. Is that right? So even if the statute covers all of this, and even if the regulatory authority was there for the solicited facts rule, the regulatory authority, you would say, I'm thinking, would also be there for the waivers, or for the change in the effectiveness of the regulation. And once the regulation allows your clients to go forward with the kind of language that they use, there's no commonality on consent. Is that your argument? There are parts of that that I agree with, and parts that I don't. I agree that if the waiver is valid, yes, common questions predominate, and the class action is not a superior method for adjudicating these cases. Common questions don't predominate, I'm sure you meant to say. I'm sorry, what's that? I said you probably meant to say common questions do not predominate. Yes, if common... Right, okay. Yes, thank you. But I don't think that you can... I don't think that the... You were talking about the FCC's authority to issue the solicited facts rule and the waiver. I don't think those are the same thing. The FCC's authority to issue the solicited facts rule is going to be dependent on what Congress prohibited in the TCPA itself. The FCC's authority to implement regulations under the solicited facts rule is only to implement regulations that implement the requirements of the Act. No, I understand that. I understand that that's your position. I was just saying, if we were to disagree with your position and think that the statute is broad enough to allow the Commission to worry about what I'm going to call future consent, not just existing consent, that might nestle the rule that everybody's decided to call the solicited facts rule, which it's not called in the Federal Register. But that might be enough to nestle the rule under the statute. But if that's true, then the FCC might also have the power to decide under what circumstances the rule is going to apply. That would save your waivers. And if the waivers are good, then the common questions are not good. Your Honor, my position is that the authority that the FCC has to issue regulations with respect to the TCPA comes from a different source than the authority that it has to issue the waiver. The authority it has to issue the waiver comes under the Telecommunications Act more broadly. It was implementing one of its own rules, Section 1.3. That's not part of the TCPA. So I take your point, but I think the sources of those FCC actions come from different places. And why does that matter? Well, because then the authority to issue the solicited facts rule isn't really tied to the authority to issue the waiver. They're different. They come from different places. You have to look at what the authority is to issue the waiver and what Congress intended there versus the authority to issue the solicited facts rule and what Congress intended with respect to that. And it's clear from the TCPA, I think, that Congress only intended to regulate unsolicited facts because it doesn't talk about facts sent with permission or invitation. All right. So let me give you this hypothetical. Suppose Humana is happily sending these faxes and it goes to Mr. Brodsky or anybody, you know, John Smith. And instead of issuing the actual faxes that you are with the phone numbers at the bottom, there's nothing, there's no contact information, there's nothing. And Mr. Brodsky decides, I'm tired of getting these faxes from Humana. How can I bail out? And he searches through the internet and he Googles and he does everything. He can't find any way to get in touch with you. Isn't that a situation that the FCC would rightly be concerned about? The facts in our case are a little bit different.  I understand, Your Honor. I think the FCC spoke to that in a 2015 order that I don't have the site in front of me. I believe it is cited in plaintiff's brief that said in there that revocation of consent can be done by any reasonable means. I certainly understand your point that it doesn't tell them exactly how to do it. It doesn't tell them, right. So I'm just trying to figure out the logic of your theory. And you're right. Your case isn't quite that bad because you did put a couple of phone numbers in. But under your theory, the FCC is powerless to say you need to give people some way to opt out, even if in the past they've accepted. And you say, no, they don't have to do that at all. So it puts a significant burden on people if you're free from any obligation. And maybe your company is a reputable company that would never do that. There are others out there in the market who are not so scrupulous. I would have to agree with you 100%. My client is a scrupulous company that would always do something like that. I think, Your Honor, I see that my time is up. No, please, please observe. I just would thank you for the opportunity to present here today. I think the only thing I would do to wrap up is to say that that question that you raised about what happens if nobody puts anything on there is something that we can expect the FCC is going to address in the upcoming rulemaking, I think, after the remand from the Bias Yakov decision, as well as the petitions for review that have been filed in all these waiver cases. Okay. All right. Thank you very much. Anything further, Mr. Haram? Yes, Your Honor. Thank you. I'd like to start where my colleague left off, on a future Hobbs Act appeal from the proceedings that are pending before the FCC right now. Because I was thinking about this yesterday, and let's say the FCC, as it's currently constituted, and the current chairman agrees with the D.C. Circuit that the FCC didn't have statutory authority to issue the opt-out regulation. So let's assume that on my client's application for review, the FCC enters a final order saying this regulation is invalid, and so you don't even need to worry about the waiver, right? We didn't have authority to issue it in the first place, so it was void ad venitio. My client is going to take a Hobbs Act appeal from that decision, and it's going to be reviewed for Chevron deference, and another Circuit Court of Appeal is going to decide whether, in fact, the FCC does have statutory authority to require opt-out notice on facts that's set with prior express permission. So what is that Circuit Court going to do? Is it going to say, my hands are tied? The D.C. Circuit has decided this issue, and it can solve it? No, it's not. At least you don't have to worry about that for me. It is a new appeal from a new order will properly go to a court, and there's going to be a holding that the 2014 order applying the 2006 rule had to be set aside, but the 2014 order won't be before your hypothetical new court. Now- Correct. The 2018 order will be before- The 2018 or the 2019 or whatever year it may be, order will be, and that court will undoubtedly give respect to whatever else has been said that was part of the rationale of the D.C. Circuit's opinion, but I think that's why it's important to be clear about what's before a court and what is not. I agree, and the defendants in that future proceeding will rely on the majority opinion in Bayes-Yakoff from the D.C. Circuit. We will rely on Judge Pillard's dissent, which strongly advocated for the position that the FCC has broad authority to implement the TCPA, and it can require opt-out notice on all faxes, period. Fax advertising is a very highly regulated activity. Congress did that on purpose, and it created stiff penalties for violations of the regulations prescribed. But you're talking about a future case. I don't see why that's this case, given the fact that what we have here is the fact that these companies, both of the defendants here, received waivers from the FCC, and the FCC appears to have the authority to construe its own regulations, or even things like our out there, which the Supreme Court's been wondering about, but it's also still out there. We give deference to agencies' interpretations of their own rules. So why isn't that a legitimate safe harbor that these particular companies get? If it was an agency enforcement proceeding, of course the FCC could waive or just choose not to enforce the regulations against any defendant that it wishes to. But there are private rights at issue here. There's my client's rights to enforce the regulations prescribed under the TCPA. And this court held in terza that that provision is there, the right to sue for the regulations prescribed under the TCPA, so that consumers do not need to rely on the FCC for enforcement. They can do it themselves. And I contrasted in our opening brief the overall structure of the TCPA. It has a tripartite enforcement scheme where private parties, such as my clients, can bring enforcement actions in district courts or state courts. State governments, state attorneys general can bring enforcement actions in district courts. The FCC can intervene in those actions if it chooses to, and it can appeal from adverse decisions in those actions if it chooses to. And then there are FCC administrative forfeiture enforcement actions. So those are all codified in the TCPA and 47 U.S.C. in various sections. But the FCC has no power to intervene in a private right of action. The appropriate court is the statutory language. The appropriate court determines if there has been a violation of the statute or the regulations prescribed under the statute. The regulation... But you're saying that the waiver regulation is not one of those regulations prescribed under the statute. I'm saying that is true. Which is... But that regulation was created by the FCC, so it's bootstrapping. Well, so what? I mean, you know, it created the first one, too. Well, it didn't create the statutory right of action, though. It didn't create the statute. That's true. And I analogize this to the securities fraud context in our briefs, where private securities fraud plaintiffs sue under the Securities Exchange Act for violations of SEC Rule 10b-5, which is what makes it illegal to make an untrue material statement of fact or omit a material statement that's necessary to make it not misleading. I'm going to disagree with you just a little bit. Because the Supreme Court would strike down a regulation that exceeded the scope of the statute. But the Supreme Court has not done that with Rule 10b-5. In J.I. Case against Borak, it says that Rule 10b-5 fits under the umbrella of the statutory Section 10b, which has pretty capacious language. And 10b-5 implements that. If 10b-5 was off there in left field, you know, or outside the stadium altogether, the court would say the agency has exceeded its authority. But that's, I agree, but that's a different question, because. So I just don't want to proceed on the basis that the regulation somehow can go beyond the scope of a statute. A regulation elaborates the scope of a statute. I agree. We maintain that the opt-out regulation in this case does fall within the FCC's statutory authority. For there to be a waiver, the thing being waived has to be valid. It has to be presumed valid. We cited FCC versus Waite Radio. It's a D.C. Circuit decision, but it involves a waiver from certain broadcasting requirements. The applicant didn't get the waiver, and it appealed that, and it got denied. It was affirmed. The denial was affirmed. But the D.C. Circuit said, if you're asking for a waiver of a requirement, you are presuming the validity of the requirement, and you're presuming that it was violated. Because without a violation of a valid rule, there's nothing to waive. I would say maybe it's just belt and suspenders. You know, maybe you think there's a problem with it, but you'll be happy if you can just get it waived, too. In any case, I can for sure say that the FCC's 2014 order granted the waivers to the parties there because it held the regulation was valid, if you know what I'm saying. It wouldn't have... No, the FCC has stuck by the validity of the regulation up until the present time, although they may change their mind based on statements that Chairman Pai and others have made. They may. I kind of touched on, you asked the question, if the agency can issue the regulation, does it necessarily have the power to waive it, too, right? And that's why I discussed the SEC regulation in there, because the SEC's never granted a waiver like that. The closest case I could find, you know, analogous case I could find, was the NRDC, National Resources Defense case from the D.C. Circuit, where the EPA issues admission standards that are enforced in private statutory citizen suits under the Clean Air Act. And the EPA tried to create, by regulation, an affirmative defense to be used in those statutory citizen suits where the polluter, the defendant, could prove that the pollution was caused by an unavoidable malfunction because their equipment was old and they hadn't updated it or whatever. And the court held the EPA didn't have the authority to do that because it's the court's job to enforce those statutory private rights of action. The EPA didn't have authority to interfere with it, even to create a defense that the defendant had to go into court and prove, whereas here, all you had to do is go to the FCC and say, I'd like one, too. I'd like a waiver, too. May I please have one? As long as you were careful not to say, we were ignorant of the law, you get one. That was the only standard. The only judge with authority to ever rule on the validity of the waivers in the 2014 order is Judge Pillard in the D.C. Circuit in her dissent from the Bayes-Yakoff majority. And she held that they were arbitrary and capricious, plainly. Well, she's dissenting, let's be fair. You know, she does write a dissent. We all respect all of the judges, and these are difficult questions, and so sometimes you'll see different viewpoints. I'd also like to touch on the question of future consent, whether you're, once you give prior express permission, let's assume a recipient does, and they get the first fax, okay, I'm not really interested in this more. You get another fax, and they keep coming, and you say, you know what, I need to stop these faxes coming through my fax machine. And you're right, and the defendant's rationale, if the sender chooses not to use opt-out notice, you can't opt out from that fax. Well, it's just very difficult. I mean, I'm very concerned about that particular implication, because if you're silent, then you put the burden on the fax recipient to search all over creation to find some way to get through to the fax sender. I think that is what motivated the decision in Terza. I think that's what that court was thinking about there, and that rationale is spelled out more thoroughly in the physician's health source versus striker case from the Western District of Michigan, where he reaches, Judge Yonker there, reached the same result as the FCC, but through interpreting an ambiguous statute. He held the TCPA as ambiguous about whether you need opt-out notice on all fax applications, and since it's a remedial statute, he interpreted it in favor of consumers. All right. Thank you very much. Thanks to all counsel. We will take this case under advisement.